No. 99-263

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 180

300 Mont. 367

4 P.3d 654

---

STATE OF MONTANA,

Plaintiff and Respondent,

v.

AARON L. JOHNSON, Sr.

Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jeff R. Lynch, Lynch Law Firm, Great Falls, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Cregg W. Coughlin, Assistant Montana Attorney General, Helena, Montana; Brant S. Light, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs: January 20, 2000

Decided: July 6, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

1. ¶In the Eighth Judicial District Court, Cascade County, Defendant Aaron L. Johnson, Sr. (Johnson), was convicted by jury on March 3, 1999, of three counts of criminal sale of dangerous drugs. Johnson appeals from the District Court's denial of his motion to dismiss for lack of speedy trial, and from the court's action in sustaining the objection of the State of Montana (the State) to Johnson's attempt to impeach the confidential informant. We affirm.

2. ¶The two issues on appeal are:

3. ¶I. Whether the District Court erred in denying Johnson's motion to dismiss for lack of speedy trial.

4. ¶II. Whether the District Court abused its discretion in sustaining the State's objection to Johnson's attempt to impeach the confidential informant.

## FACTUAL AND PROCEDURAL BACKGROUND

1. ¶On June 10, 1998, Johnson sold one-quarter gram of cocaine to Kathy Hart (Hart), a reliable and experienced confidential informant for the Great Falls Police Department. Prior to the sale, Hart was searched by law enforcement officials to control the drug transaction and preserve the evidence by ensuring that she possessed only the $50 cash provided by the officers to make the drug buy. Hart was also outfitted with a "wire" or electronic transmitting device, which enabled the officers to listen to and record any conversation that occurred during the drug sale. Additionally, from the time she was searched through the consummation of the deal, law enforcement officials visually observed either Hart or her location. After the transaction, which occurred in the area of Fourth Avenue South and Tenth Street in Great Falls, Hart was again searched and the officers took receipt of the drugs. The substance Johnson sold Hart on June 10, 1998, field-tested positive for cocaine. It was then sent to the State Crime Laboratory, where it was tested by a forensic

chemist and determined to be .14 grams of the controlled substance cocaine.

2. ¶On June 12, 1998, confidential informant Hart was again preliminarily searched, provided with $100 cash, fitted with a wire, and directed to attempt to purchase one gram of "crank" or methamphetamine from Johnson. She was again surveilled by law enforcement officials as she walked to Johnson's residence. Johnson told Hart to get in his car, and they again proceeded to the same Fourth Avenue South location where they had completed the drug transaction two days earlier. Johnson took the $100 from Hart, walked up the street, and returned several minutes later with a paper "bindle" which he handed to Hart. After the transaction, Hart was picked up by the officers, searched, and the drug bindle was taken into evidence. The substance Johnson sold Hart on June 12, 1998, field-tested positive for crank, and was subsequently determined by a forensic scientist for the State Crime Laboratory to be .33 grams of the controlled substance methamphetamine.

3. ¶On June 19, 1998, Johnson again sold dangerous drugs to Hart in her capacity as a confidential informant. Following the same procedure outlined above, Hart proceeded to Johnson's residence under police surveillance, the two then climbed in Johnson's car, and Hart proceeded to purchase a "gram" of what was believed to be crank from Johnson for $90. After the drug deal, police searched Hart and took receipt of a foil bindle containing a substance which field-tested positive for amphetamine. Subsequent testing by a forensic scientist for the State Crime Laboratory corroborated that the substance Johnson sold Hart on June 19, 1998, was .48 grams of the controlled substance amphetamine.

4. ¶Johnson was charged by Information on July 23, 1998, with three counts of criminal sale of dangerous drugs, felony offenses in violation of § 45-9-101, MCA (1997). Johnson's bail was set at $25,000. The case proceeded through the pre-trial process. On August 12, 1998, Johnson filed a Motion for Discovery and Assertion of Right to Fair and Speedy Trial. Following a bail hearing on August 18, 1998, the District Court denied Johnson's request either to release him on his own recognizance or to reduce his bail to $2000.

5. ¶The District Court scheduled the jury trial in this matter for November 30, 1998. Johnson filed, on November 20, 1998, a Notice of Intent to Proceed to Trial as Scheduled. On November 24, 1998, the State moved for a continuance on the ground that the State's chief witness, Detective Jeff Beecroft, was out of state interviewing witnesses in a federal case and would not return until the following week. Finding good cause for the motion, the court vacated the November 30, 1998 jury trial date and rescheduled it for December 14, 1998. Then, on December 10, 1998, the State again moved the District Court to continue the trial date for the

reason that an essential state witness, forensic scientist Annalivia Harris, had been subpoenaed to testify in other courts during the time set for trial. The court, again finding good cause for the State's motion, granted a continuance and rescheduled the jury trial for January 25, 1999. However, because of an irreconcilable conflict in the court's calendar, the District Court acted *sua sponte* on January 22, 1999, and reset the jury trial in this matter for March 2, 1999.

6. ¶Johnson filed a motion to dismiss the criminal charges on speedy trial grounds on March 1, 1999. The following day, prior to the start of trial and over strenuous objections of the prosecutor, the District Court heard argument from Johnson on the speedy trial motion. The court issued a written order denying Johnson's motion on March 3, 1999. The jury trial began on March 2, 1999. During trial, the District Court sustained the prosecutor's objections to two questions posed by Johnson to Hart having to do with her possible evasion of income taxes on the $60 she earned while acting as a confidential informant in the three drug transactions at issue. The jury returned its unanimous guilty verdicts on March 3, 1999. A sentencing hearing was held on April 13, 1999, and sentence was orally pronounced by the District Court. Other facts will be set forth as necessary in our discussion.

## DISCUSSION

### I.

1. ¶**Did the District Court err in denying Johnson's motion to dismiss for lack of speedy trial?**

2. ¶A criminal defendant's right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. State v. Matthews (1995), 271 Mont. 24, 27, 894 P.2d 285, 287. As a general matter, the right to a speedy trial places on the State the burden of diligent prosecution at all stages of a criminal proceeding. *See* State v. Kipp, 1999 MT 197, ¶ 16, 295 Mont. 399, ¶ 16, 984 P.2d 733, ¶ 16; State v. Tweedy (1996), 277 Mont. 313, 318, 922 P.2d 1134, 1137 (citing State v. Tiedemann (1978), 178 Mont. 394, 400, 584 P.2d 1284, 1288).

3. ¶Since the question of whether a defendant has been denied a speedy trial raises a matter of constitutional law, we review the district court's conclusions of law on the right to a speedy trial to determine if its interpretation of the law is correct. *See* State v. Maier, 1999 MT 51, ¶ 74, 293 Mont. 403, ¶ 74, 977 P.2d 298, ¶ 74; State v. Olmsted, 1998 MT 301, ¶ 27, 292 Mont. 66, ¶ 27, 968 P.2d 1154, ¶ 27. The only

remedy for denial of the speedy trial right is dismissal of the State's case. *See* Strunk v. United States (1973), 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56, 61.

4. ¶Johnson contends that the District Court erred in denying his motion to dismiss for lack of a speedy trial, particularly, by failing to recognize the prejudice he suffered by the pre-trial delay in this case. Since 1972, this Court has evaluated speedy trial claims based on the four-pronged balancing test established by the United States Supreme Court in Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101; *see also* City of Billings v. Bruce, 1998 MT 186, 290 Mont. 148, 965 P.2d 866 (clarifying this Court's case law interpreting and applying *Barker*), *as modified by* State v. Hardaway, 1998 MT 224, 290 Mont. 516, 966 P.2d 125. Pursuant to the *Barker* test, there are four factors which must be assessed in reviewing any claim that a speedy trial was denied: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. No single factor of the *Barker* test is "indispensable or dispositive." *Tweedy*, 277 Mont. at 320, 922 P.2d at 1138; *accord Bruce*, ¶ 75. Rather, the four factors established in *Barker* are necessarily general guidelines to be applied on a case-by-case basis as part of a " 'difficult and sensitive balancing process.' " *Bruce*, ¶ 20 (quoting *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118). We analyze and balance each of the four factors below in light of our recent clarification of the *Barker* test in *Bruce*.

### *1. Length of Delay*

1. ¶As elucidated in *Bruce*, the first *Barker* factor looks to the length of delay from the time the charges are filed until the defendant's trial date. The purpose of this inquiry is to make a threshold calculation as to whether there is any basis for conducting further speedy trial analysis. In order to make that initial determination, "[t]his period of time will be calculated without assignment of fault to either party for the various periods of delay." *Bruce*, ¶ 55. In *Bruce*, after surveying our speedy trial case law, we held that a delay of at least 200 days is necessary to "trigger" further speedy trial analysis. *Bruce*, ¶ 55.

2. ¶Here, the parties agree that the period of delay between the filing of the charges against Johnson and the date of trial was 230 days. Without assigning fault to either party for the various periods of delay, it is clear that this case meets the 200-day threshold required by *Bruce*. We conclude that further speedy trial analysis is necessary. Thus, we proceed to evaluate the other *Barker* factors.

## 2. Reason for Delay

¶Under the second *Barker* factor, we allocate between the parties the periods of delay attributable to each party. The purpose of this inquiry is to determine which party bears the burden of proving prejudice to the defendant (or lack thereof) as a result of delay in the trial process. Therefore, we held in *Bruce* that when at least 275 days of delay are attributable to the State, we indulge a rebuttable presumption of prejudice and shift the burden of proof to the State "to demonstrate that the defendant has not been prejudiced by the delay." *Bruce*, ¶ 56. In contrast, "[i]f the delay attributable to the State is less than 275 days, the burden remains on the defendant to demonstrate prejudice." *Bruce*, ¶ 56.

¶Here, since the total delay in the trial process is below the 275-day threshold necessary to shift the burden to the State, allocating the periods of delay between the parties is inconsequential. *See* State v. Stanko, 1998 MT 323, ¶ 30, 292 Mont. 214, ¶ 30, 974 P.2d 1139, ¶ 30 (stating that it is "immaterial" under such circumstances to apportion the periods of delay between the parties, since "the burden remains on the defendant to demonstrate prejudice"). Even if the full 230-day delay were attributable to the State, that period of delay is insufficient, under *Bruce*, to shift the burden to the State. *See Olmsted*, ¶ 53. We conclude, therefore, that Johnson bears the burden of demonstrating that he suffered prejudice as a result of the pre-trial delay.

¶However, for purposes of subsequently assessing prejudice, we proceed to allocate the periods of delay between Johnson and the State. In this case, the bulk of delay (190 days) was due to the State's two motions for continuance of the trial date, while the remaining delay (40 days) was attributable to the District Court's *sua sponte* continuance of the trial date due to calendaring conflicts. Trial delay "caused by crowded court dockets and corresponding difficulties in setting trial dates" is "institutional delay" chargeable to the State. *Tweedy*, 277 Mont. at 320-21, 922 P.2d at 1138; *See also* State v. Hembd (1992), 254 Mont. 407, 413, 838 P.2d 412, 416. However, institutional delay weighs less heavily against the State than does "purposeful" or delay. *Matthews*, 271 Mont. at 29, 894 P.2d at 287; State v. Weeks (1995), 270 Mont. 63, 72, 891 P.2d 477, 482.

¶Hence, all 230 days of delay in this case are attributable to the State. Nonetheless, the institutional delay caused by the District Court's crowded docket, though chargeable to the State, does not weigh heavily against it. Further, the two continuances requested by the State in this trial were supported by good cause, namely, the unavailability of key prosecution witnesses on the scheduled trial dates.

Therefore, this period of delay, although directly attributable to the State, was not the result of intentional or purposeful foot-dragging on the part of the State. This Court also notes that Johnson did not lodge any objections to the State's two motions to continue the trial date. In short, we agree with the District Court that there is no indication in the record that the State harbored any motive to unduly delay Johnson's trial date and, therefore, "that the degree of fault of the State for these periods of delay is minimal."

### 3. Assertion of Right by Defendant

¶We held in *Bruce* that the third prong of the *Barker* test is satisfied if the defendant invokes the constitutional right to a speedy trial at any time prior to commencement of trial, either by demanding a speedy trial or by moving to dismiss for failure to provide a speedy trial. *See Bruce*, ¶ 57. Here, not only did Johnson assert his speedy trial right in his motion filed August 12, 1998, well in advance of the trial date, but he also filed a motion to dismiss the charges on grounds of a speedy trial violation on March 1, 1999, just prior to actual commencement of the trial on March 2, 1999. We conclude that Johnson properly invoked his constitutional right to a speedy trial prior to commencement of the trial in this matter. **4. Prejudice to Defendant**

¶Hence, the resolution of Johnson's speedy trial claim comes down to the final *Barker* factor, whether Johnson suffered prejudice as a result of the 230-day delay in the trial process. As already determined herein, Johnson bears the burden of demonstrating prejudice.

¶Pursuant to *Barker*, prejudice to the defendant may be established based on any or all of the three traditional concerns that the right to a speedy trial is designed to protect against: (a) pre-trial incarceration; (b) anxiety and concern to the defendant; and (c) impairment of the defense. *See Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. The most important of these three concerns is the last, impairment of the defense, " 'because the inability of a defendant adequately to prepare his [or her] case skews the fairness of the entire system.' " *Bruce*, ¶ 19 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118). To determine whether Johnson has sustained his burden of proving prejudice, we address each of the traditional bases for prejudice in turn.

### a. Pre-Trial Incarceration

¶The first basis for assessing prejudice is present here. Johnson was incarcerated for

the entire 230-day period between the filing of the charges and the commencement of trial. Johnson argues that he suffered an impairment to his liberty by virtue of the lengthy pre-trial incarceration, which substantially limited "his ability to assist with his defense." That Johnson suffered an impairment to his liberty is undoubtedly true. However, he provides this Court with no evidence or indication of what, if anything, he could or would have done to "assist" in his defense had he not been incarcerated pending his trial. And, while we agree with Johnson that pre-trial incarceration suggests a greater degree of prejudice to the defendant, and can be sufficient under particularized circumstances to constitute prejudice standing alone, we disagree with Johnson that his pre-trial incarceration proves prejudice in this case.

2. ¶Johnson remained incarcerated pending his trial, principally, because he was unable to post the $25,000 bail required by the District Court. Although the court refused his request to reduce his bail to $2,000 or to release him on his own recognizance, the record does not support Johnson's intimation on appeal that the District Court was unwilling to admit him to any lesser bail.

3. ¶Importantly, a defendant's right to a speedy trial is not designed to prevent any pre-trial incarceration whatsoever. Rather, *Barker* instructs that the speedy trial right is designed only "to prevent oppressive pre-trial incarceration." *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118 (emphasis added). Thus, as we have suggested since the *Bruce* decision, the proper inquiry is whether a defendant was "unduly prejudiced by pretrial incarceration." *See Kipp*, ¶ 20 (emphasis added).

4. ¶As the State indicates, the only possible basis in the record for prejudice due to pre-trial incarceration was Johnson's complaints about inadequate medical treatment while incarcerated. However, the record does not support a conclusion that Johnson was unduly prejudiced by the medical conditions in jail. Rather, both Johnson's testimony at the hearing on his speedy trial motion as well as the medical records militate in favor of finding little prejudice here.

5. ¶In addressing Johnson's allegation of prejudice due to medical treatment while incarcerated, the District Court found that Johnson

did receive treatment for his medical complaints. In fact, [Johnson]'s requests for medical attention ended in August, 1998, just over one month after his arrest. [Johnson]'s final medical request, dated August 16, 1998, states:

"(Ex-meds) seem to be working nicely now if I can get my blood pressure checked and my weight . . . . I'm not in the best of shape and was in poorer shape when I got here. Just would like to keep a eye on things. Thank you."

Clearly, [Johnson]'s complaints and anxiety [about his medical condition] had been greatly relieved within a short amount of time.

1. ¶We agree with the State that Johnson's medical complaints bore no relationship to his pre-trial incarceration, nor to the delay in bringing him to trial. In fact, Johnson's medical problems existed prior to his arrest in this matter. And, by his own admissions, Johnson received prompt medical treatment while incarcerated, and his medical condition improved during his incarceration. We conclude that Johnson was not unduly prejudiced by pre-trial incarceration in and of itself. Neither the length nor the conditions of incarceration indicate that Johnson's pre-trial incarceration was oppressive in nature. However, we keep in mind the fact of pre-trial incarceration as we move on and evaluate the other bases for prejudice.

### b. Anxiety and Concern

1. ¶Johnson alleges that he suffered substantial anxiety and concern due to the "economic hardship" of lost income caused by delays in the trial process. Johnson correctly acknowledges that "a certain amount of anxiety and concern is inherent in being accused of a crime." *Olmsted*, ¶ 57. However, as Johnson argues, "[e]conomic hardship has been recognized as one form of prejudice that can flow from the deprivation of a defendant's speedy trial right . . . ." State v. Bailey (1982), 201 Mont. 473, 481, 655 P.2d 494, 498 (citing State v. Harvey (1979), 184 Mont. 423, 435, 603 P.2d 661, 668; United States v. Marion (1971), 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478). In *Bailey*, this Court held that the record supported the defendant's claim of prejudice due to suffering economic hardship while incarcerated, since there was evidence that the defendant had been forced to give up his job in Indiana so that he could return to Montana to defend against the criminal charges at issue there. *See Bailey*, 201 Mont. at 480-81, 655 P.2d at 498.

2. ¶We disagree with Johnson that the same result should obtain here. First, in contrast to the defendant in *Bailey*, Johnson bears the burden of proving prejudice; the State does not bear any burden of rebutting presumptive prejudice. Therefore, to discharge his burden of proof, Johnson is obligated to provide this Court with "evidence" that he "suffered economic hardship." *See Olmsted*, ¶ 57. The simple fact that Johnson's pre-trial incarceration prevented him from working is insufficient, without more, to prove prejudice. Johnson neither alleges nor shows that his pre-trial incarceration either resulted in a lost job opportunity or forced him to give up a preexisting job.

3. ¶Second, the situation in *Bailey* is clearly distinguishable from the case at bar. The *Bailey* Court found prejudice because the "economic hardship the defendant suffered [was] a <u>direct result of error in the handling of th[e] case by the State</u>." *Bailey*, 201 Mont. at 481, 655 P.2d at 499 (emphasis added). In *Bailey*, the defendant moved to dismiss the first information filed by the State because it was untimely, and the trial court issued an order dismissing the information on that basis. "After that dismissal and in apparent reliance on the District Court's order, the defendant moved to Indiana and obtained employment." *Bailey*, 201 Mont. at 475, 655 P.2d at 495-96. The State then filed a new information against the defendant alleging the same charge, thus forcing the defendant to forego his newfound employment in Indiana so as to defend against the newly-filed charge in Montana. In other words, the economic hardship suffered by the defendant in *Bailey* was the causal result of procedural error by the State and, therefore, the defendant was directly prejudiced by the delays attributable to the State's error. Here, in contrast, there is no indication of any error in the prosecution of Johnson by the State, nor of any motive on the part of the State to delay trial in this matter.

4. ¶Johnson has simply failed to prove that he suffered any actual economic hardship; his contentions about lost income are purely speculative and unsupported in the record. We conclude that Johnson has failed to prove prejudice on the grounds of economic hardship. Nor is there any indication in the record that Johnson has suffered anxiety and concern of a higher order than does any defendant facing felony charges.

### c. Impairment of Defense

1. ¶We now turn to the " 'most serious' " type of prejudice to the defendant that the speedy trial right is designed to shield against, impairment of the defense. *See Bruce*, ¶ 19 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118). This interest of the defendant carries more weight than the other bases for finding prejudice, because loss of evidence and especially memory due to passage of time " 'is not always reflected in the record . . . .' " *Bruce*, ¶ 19 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118).

2. ¶Johnson alleges that he was prejudiced by the trial delay in this case "based upon considerable disintegration of his relationship with his counsel." However, the State responds that the record shows that difficulties in the attorney-client relationship between Johnson and his counsel existed, as the District Court found, "almost from the beginning of this case." Indeed, Johnson's numerous complaints about his

counsel, which he filed with the Commission on Practice, the Public Defender's Office, and the District Court, began even before the State filed its first motion for a continuance of the trial in this matter.

3. ¶Perhaps more importantly, the substance of the complaints levied by Johnson against his counsel consistently focused, as the State correctly maintains, on Johnson's allegations that he had not had sufficient contact with his court-appointed attorney. Both Johnson and his counsel testified at the hearing on the speedy trial motion, with Johnson again voicing his complaint of minimal attorney-client contact pending trial and Johnson's counsel explaining without elaboration that he and Johnson had a preexisting dispute that was "aggravated" by the three continuances of the trial date. This testimony suggests that the acrimonious relationship between Johnson and his counsel, while perhaps exacerbated by the trial delay, cannot be said to be attributable to the delay.

4. ¶Crucially, neither Johnson nor his counsel presented any evidence, beyond speculation, that Johnson had suffered prejudice to his theory of defense as a result of trial delay. For example, Johnson did not even attempt to show that he had suffered the loss of key defense witnesses or evidence, or that the memory of defense witnesses had deteriorated due to the delay in his trial. In rejecting his speedy trial motion, the District Court thus pronounced that:

No evidence has been presented that the defense has been impaired due to the loss of witnesses or evidence or due to deterioration of memories, etc. [Johnson]'s assertions of impairment of his defense are very broad, general, and unsupported statements that the lapse of time has had a detrimental effect on his ability to present a defense.

1. ¶Furthermore, as the District Court noted in denying Johnson's motion, both Johnson and his attorney stated at the hearing that they were prepared to go forward with the trial. The trial did proceed as scheduled and, as the State indicates, Johnson's defense strategy at trial only served to confirm the District Court's finding that the defense was not impaired by the delay. At trial, Johnson offered little in the way of a factual defense to the charges, relying instead on his claim that he was only a middleman in the transactions between Hart and the true drug dealers (whom he refused to name). In pursuing this theory of reduced culpability (i.e., mere possession of dangerous drugs) Johnson's testimony substantially corroborated the testimony of prosecution witnesses regarding the actual delivery of the drugs in the three transactions at issue. Johnson's testimony did not demonstrate that trial delay caused him to suffer from any loss of memory, nor is there any indication in the

record that his defense theory of reduced culpability suffered from the loss of supporting witnesses or evidence.

2. ¶ In conclusion, while we acknowledge that Johnson suffered some minimal degree of prejudice by virtue of pre-trial incarceration, we determine that Johnson has failed to carry his burden of demonstrating that he suffered prejudice from trial delay rising to the level of a speedy trial violation. This Court stated in *Bruce* that "the importance of [the prejudice] factor and the degree of prejudice to establish denial of speedy trial will vary based upon other considerations, such as the length of delay and reason for the delay." *Bruce*, ¶ 58. We have already established that the delay in the trial process here was not so lengthy as to raise a presumption of prejudice, and that the delay, though attributable entirely to the State, was not the result of an intentional filibuster on the part of the State. After carefully weighing the four prongs of the *Barker* test, we hold that the District Court correctly denied Johnson's motion to dismiss for lack of a speedy trial.

## II.

1. ¶**Did the District Court abuse its discretion in sustaining the State's objection to Johnson's attempt to impeach the confidential informant?**

2. ¶This Court reviews a trial court's evidentiary rulings for an abuse of discretion. State v. Lantis, 1998 MT 172, ¶ 52, 289 Mont. 480, ¶ 52, 962 P.2d 1169, ¶ 52.

3. ¶Johnson argues that the District Court improperly sustained the prosecutor's objection to two questions posed to the confidential informant. Regarding the $60 that the confidential informant, Hart, was paid by the Great Falls Police Department, Johnson's counsel inquired of Hart on cross examination as follows:

Q: Did the police department give you a 1099 form or a W-2 form?

A: No.

¶43 At this point the prosecutor objected on the ground that the question was irrelevant. The District Court sustained the objection. Johnson's counsel did not respond to the State's objection, nor did he at any time suggest to the District Court that his question was an attempt to impeach Hart's credibility or to expose illegal conduct by the Great Falls Police Department.

¶44 Johnson's counsel then queried Hart as to what she had done with the $60

remuneration, to which she responded she had spent it:

Q: You spent it. Did you claim it on taxes?

A: I didn't file taxes last year.

Q: And you never received any receipt in your own possession for this

amount of money . . . you received from the police?

A: No, I don't have a receipt.

Q: So, in essence, the Great Falls Police Department has assisted you in

evading taxes?

¶45 At this point, the prosecutor again objected to Johnson's line of questioning. However, the prosecutor did not state a ground for the objection. The District Court sustained the objection without comment. Johnson's counsel neither responded to the State's objection, nor requested that the court provide a basis for the ruling. Indeed, Johnson's counsel did not assert that the question was in any way pertinent or permissible.

¶46 On appeal, Johnson contends that the District Court's rulings "specifically prevented" him from attacking the credibility of both the confidential informant and the law enforcement officers involved in this case, thus denying his "fundamental right of cross-examination." We disagree. The State points to deficiencies in Johnson's line of questioning making it objectionable: that it lacked a proper foundation (since Johnson never established an obligation by Hart to file an income tax return or an obligation by the Great Falls Police Department to provide her with "a 1099 form or a W-2 form"); that it called for witness speculation (since a foundation was never established showing that Hart had any knowledge of the alleged attempt by the police to aid her in evasion of taxes); and that Johnson never raised the subject of income tax evasion with any other relevant witnesses (since officers or employees of the Great Falls Police Department would be more likely to have knowledge about what tax documents, if any, were required to be provided to Hart). On those bases, the State argues that the District Court did not abuse its discretion in sustaining the objections to Johnson's cross-examination of Hart.

¶47 Ultimately, however, we need not decide whether the court abused its discretion. Rather, we agree with the State that Johnson has failed to demonstrate that the District Court's rulings prejudiced his substantial rights. Johnson never offered any evidence at trial to independently establish that tax fraud occurred. On appeal, Johnson does not provide this Court with any indication as to how he would have pursued the line of questioning had it been allowed by the District Court, or how an attack on the credibility of the confidential informant or the police department would have furthered his defense. Indeed, as previously mentioned, Johnson offered little in the way of a factual defense to the State's charges and did not substantially dispute the facts surrounding the drug transactions as testified to by Hart and the officers who witnessed them.

¶48 Even if the District Court's rulings did amount to an abuse of discretion, there is no indication in the record "that the error was prejudicial." Section 46-20-701(1), MCA. "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Section 46-20-701(2), MCA; *see also* § 46-20-104, MCA. We hold that Johnson has failed to demonstrate that in sustaining the State's objections, the District Court prejudiced his substantial rights.

¶49 Affirmed.

/S/ WILLIAM E. HUNT, SR.


We Concur:


/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER